THE CITY OF PATERSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND THE BOARD OF FINANCE OF THE CITY OF PATERSON, PLAINTIFFS, v. THE HOUSING AUTHORITY OF THE CITY OF PATERSON, A BODY CORPORATE OF THE STATE OF NEW JERSEY, JOHN C. WEGNER, HAROLD C. BROWN, JOSEPH AQUINO, CARL LEMBO, JAMES H. JACKSON AND FLORENCE BRAWER, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided July 19, 1967.

Mr. *Robert P. Swartz*, City Counsel, for plaintiffs.

Mr. *Samuel Raff* for defendants.

MOUNTAIN, J. S. C. The Housing Authority of the City of Paterson contests the validity of certain acts taken by the governing body of the city in an avowed attempt to divest the Authority of powers it is presently exercising. The action of the city, if sustained, will result in a transfer of these powers to the city which will thereafter continue to exercise them itself as a local public agency. The question presented appears to be one of novel impression in this State.

For at least the last 30 years government in this country has been actively concerned with the problems of slum clearance, the creation and maintenance of sufficient and adequate low-income housing, urban renewal and the rehabilitation and redevelopment of blighted areas. In 1937 the *United States Housing Act*, 42 *U. S. C.* § 1401 *et seq.* gave initial impetus to this effort. This statute, as amended and supplemented from time to time, has made available to local communities very large sums of money by way of federal subsidy. The program outlined in the statute requires implementation at the state level in the form of legislation permitting the creation in local communities of instrumentalities designed to carry out the legislative purposes. In New Jersey legislation looking to this end in the form of the Local Housing Authorities Law was promptly adopted (*L.* 1938, *c.* 19; *N. J. S. A.* 55:14A–1 *et seq.*) This statute permits but does not require municipalities

(or two or more municipalities acting together) to establish municipal or regional housing authorities. An authority consists of six members, five of whom are appointed by the governing body of the municipality and the sixth by the executive officer. of the Public Housing and Development Authority in the State Department of Conservation and Economic Development. The authority is a public body, corporate and politic, exercising public and essential governmental functions. Among other powers it is authorized to sue and be sued, to have perpetual succession, to make and execute contracts and other instruments necessary or convenient to the exercise of its powers, and to make and from time to time amend and repeal by-laws, rules and regulations. It is further authorized to acquire, lease and operate housing projects and to provide for their construction, reconstruction, improvement, alteration or repair. It may arrange or contract for the furnishing by any person or agency, public or private, of services, privileges, works or facilities for or in connection with a housing project or the occupants thereof. It may establish or revise rents or charges in respect of any housing project, may own and improve real or personal property and purchase, lease, transfer, assign or pledge the same. It may exercise the power of eminent domain. Authorization is given to investigate into living, dwelling and housing conditions and into the means and methods of their improvement, to determine where slum areas exist or where there is a shortage of decent, safe and sanitary dwelling accommodations for persons of low income and to make studies of recommendations relating to the problem of clearing, replanning and reconstructing slum areas. It may cooperate with any public body, including the municipality by which it has been created, in any action taken in connection with any such problem. It is given power to issue bonds and in connection therewith to pledge its future income, mortgage its real or personal property, including after-acquired assets, and bind itself by a variety of covenants designed to protect the interests of the bond-

holders. Naturally enough its powers include the right to borrow money or accept grants or other financial assistance from the federal government, all upon such conditions and subject to such restrictions as may be required. Housing projects owned by a housing authority are tax-exempt, but payments in lieu of taxes may be made. Later amendments and supplements to the Local Housing Authorities Law, notably *L*. 1949, *c*. 300 and *L*. 1956, *c*. 211, granted housing authorities the right to initiate and carry out redevelopment projects, as well as conservation and rehabilitation work in blighted areas. This included the power to acquire, demolish or rehabilitate buildings as well as to install or construct streets, utilities, parks and playgrounds. These powers are broad and comprehensive. It is clearly the legislative design that an entity clothed with powers of such amplitude should be an important and influential arm of government in the area in which it is intended to act.

At the same time a considerable degree of control over a housing authority rests with the governing body of the municipality. It must first authorize, by ordinance, the initiation and carrying out of any redevelopment project; it determines the existence of a "blighted area"; it may order the authority, or its officers or employees, to comply with the provisions of any approved redevelopment plan, to maintain uniform systems of accounts and to file. at times and in manner prescribed by the governing body, reports and answers to specific questions. Annual estimates must receive municipal approval and expenditures or disbursements lacking such approval are forbidden.

It is clear that the drafters of this legislation contemplated, or at least hoped, that there would be effective cooperation between a local housing authority and the municipality that had brought it to life. In addition to including a provision looking to this end in the Local Housing Authorities Law itself (*N. J. S. A.* 55:14A–40), the same legislature adopted, at exactly the same time, the Housing Cooperation Law (*L*. 1938, *c*. 20; *N. J. S. A.* 55:14B–1

*et seq.*). This statute expressely authorizes municipalities to cooperate with their local housing authorities in a variety of ways. Municipal property may be dedicated, sold, conveyed or leased to an authority. Parks, playgrounds, recreational, community, educational, water, sewer or drainage facilities may be provided. Streets and sidewalks may be installed; planning, zoning and building regulations may be altered and in general anything may be done necessary or convenient "to aid and co-operate in the planning, undertaking, construction or operation of * * * housing or redevelopment projects." *N. J. S. A.* 55:14B–4(f). It is especially worthy of note that the governing body is authorized to "Enter into agreements (which may extend over any period, notwithstanding any provision or rule of law to the contrary), with a housing authority * * * respecting action to be taken by such public body (*municipality*) pursuant to any of the powers granted by this act. If at any time title to, or possession of, any project is held by any public body (*including, by definition, a housing authority*) * * * authorized by law to engage in the development or administration of low-rent housing or slum clearance projects * * *, the provisions of such agreements shall inure to the benefit of and may be enforced by such public body (*housing authority*) * * *." *N. J. S. A.* 55:14B–4(e) (italicized portions supplied).

On March 23, 1967 the Housing Authority of the City of Paterson filed suit in the Chancery Division of this court against the City of Paterson. On the same day the City instituted suit against the Authority by way of prerogative writ in the Law Division. The former action has been consolidated within the latter. In brief, by steps taken in March of this year, the City sought to remove from the control of the Authority certain rehabilitation projects with which the latter was actively engaged. The Authority resisted and has asked the court to determine its rights. In order to consider the issues involved in proper context it will first be necessary to set forth briefly the history of the

Housing Authority and particularly its relationship to the City with respect to the projects concerned.

The Housing Authority of the City of Paterson was created by ordinance enacted by the governing body of the City January 23, 1941, pursuant to the Local Housing Authorities Law. Parenthetically it should be pointed out that the municipal government of the City of Paterson is rather unusual. For present purposes it will be convenient and sufficiently accurate to say that "the governing body" may be considered the Board of Finance and the Board of Public Works acting concurrently. On November 3, 1949, pursuant to a then recent amendment to the Local Housing Authorities Law (L. 1949, c. 300) the governing body adopted an ordinance authorizing the Authority to carry out redevelopment projects and in so doing to possess all the rights, powers, privileges and immunities conferred by this statute. We then move ahead to 1961. In that year the Authority entered into a contract with the United States of America acting through the Federal Housing and Home Finance Agency by the terms of which the Authority received a loan in the amount of $63,870 for the purpose of completing a comprehensive study of the slum clearance and urban renewal problem in the city. The Authority agreed to repay the amount of this advance. By the end of 1961 this study, known as the General Neighborhood Renewal Plan, had been completed and had received the formal approval of the Authority, the local Planning Board and governing body. Apparently nothing was done immediately to put the plan into execution but in the summer of 1963 the plan was formally embodied in the municipal master plan by act of the Planning Board and in September of the same year a new resolution of approval was adopted by the governing body. The General Neighborhood Renewal Plan covered some 545 acres and it was never contemplated that the entire project would be undertaken at once. In September, 1964, the governing body adopted an elaborate resolution approving, as a particular phase of

the whole undertaking, Urban Renewal Project N. J. R.–103. The area included within Project 103 is referred to as the Central Business Area and consists of a substantial portion of downtown Paterson. The resolution contains very clear pledges of cooperation on the part of the City. Implementing this pledge the City, on January 1, 1965, entered into a so-called Cooperation Agreement with the Authority. Such an agreement is required if federal financial assistance is to be forthcoming. 42 *U. S. C.* § 1415(7)(b). By the terms of this agreement the City undertook to reimburse the Authority for what is described as the estimated ineligible portion of site improvement and clearance cost in the amount of approximately $640,000; it agreed to allow the Authority certain tax credits in an estimated amount of $400,000 and undertook, without expense to the Authority, to vacate various streets and dedicate the vacated areas to the Authority. It further agreed to undertake its obligations at such times as should coincide with the construction and progress of the entire project and to complete all work within a reasonable time after commencement. The agreement specifically states that the City acknowledges an obligation to make cash or noncash grants in aid in a total amount equal to not less than one-quarter of the total actual net cost of the project, such net cost being estimated at approximately $30,000,000. Finally it was provided that the contract might "be amended from time to time by mutual agreement of the parties thereto, subject to the approval of the Housing and Home Finance Agency." Immediately thereafter, on February 24, 1965, the Authority entered into a Loan and Capital Grant Contract with the United States of America acting through the Housing and Home Finance Agency. It is stated without denial that approximately $4,000,000 has been received by the Authority from the United States under the terms of this agreement, which the Authority is under obligation to repay. It has entered into a contract with the local Parking Authority to facilitate construction of a multi-story public garage and

with a redeveloper for the construction by him of a large commercial building. At the time suit was instituted it was negotiating for the acquisition of an entire city block. On March 9, 1967, the governing body, by ordinance, sought to rescind the power theretofore given the Authority to carry out redevelopment projects. The ordinance specifically directed that obligations of the Authority incurred or assumed in connection with Project 103 and Project 143 (of which more hereafter) be assumed by the municipality upon the execution and delivery of an agreement of novation between the City and the United States of America, substituting the City for the Housing Authority under any and all existing contracts or grants. The municipal action further provided that thereafter, pursuant to *N. J. S. A.* 55:14A–56, the City itself, in place of the Housing Authority, would directly exercise the powers conferred by the Local Housing Authorities Law. The last mentioned provision (included in the statute for the first time by virtue of the 1956 amendment) states that, "Nothing in this act shall prohibit a municipality, if it so determines, from exercising the powers conferred herein, either directly or by designating another public body to exercise the powers conferred by this act." It is essentially upon this statutory provision that the City relies as justification for its action. It argues that the Authority has been created by the municipality and is its agent; that what the City has created it can change and that the statute quoted above gives it the alternative, of which it may avail itself at any time, of going forward with urban renewal and redevelopment projects itself, even though these have been begun by the Housing Authority. It further points out that by the terms of the repealing ordinance it has specifically undertaken to assume all obligations of the Authority and it refers to a letter received from the Regional Office of the Housing and Home Finance Agency in Philadelphia stating that the latter will have no objection to proceeding with the projects in the manner outlined by the City.

 Our courts have had occasion to examine the nature of a housing authority. As observed by Judge (now Justice) Proctor in *Monte v. Milet,* 17 *N. J. Super* 260 (*Law Div.* 1952), the powers of such an authority are derived directly from the state and are not bestowed by the municipality. The governing body in appointing and removing members is merely acting as a statutory agent. A housing authority is not a subordinate branch of the governing body. It possesses governmental powers such as that of eminent domain and enjoys governmental privileges such as tax exemption. It is by no means a municipal agent, at least in the commonly understood sense of the word. In *Tumully v. Jersey City,* 57 *N. J. Super* 503 (*App. Div.* 1959) the court pointed out that a local housing authority is not a municipal function but a separate independent entity. It significantly added (page 512) that "the Legislature did not want the Authority dominated by the governing body." It has further been indicated that in entering into a contract with the municipality, the Authority (here Parking Authority) acts as a principal. *State v. Parking Authority of the City of Trenton,* 29 *N. J. Super.* 335, 338 (*App. Div.* 1954). Such an authority is unique in character, fulfilling, as it does, responsible relationships with the city, the state and the nation. *O'Keefe v. Dunn,* 89 *N. J. Super.* 383, 395 (*Law Div.* 1965) aff'd. 47 *N. J.* 210 (1966). Nothing in our case law interpreting this legislation affords any support for the view of the City that the Authority is merely a municipal agent in a definitely subordinate position to the City. Indeed one may go further. The municipality itself, in its relationship to the Authority, is an agent of the State acting to fulfill the public purposes set forth in the statute. In this relationship it is not controlled by general principles of the law of municipal corporations; the source of its powers and the measure of its obligations are to be found solely in the legislation authorizing the creation of the Authority—the City has become an agent of the State to act for it in this area of public

concern, such action to be undertaken in concert with the Authority and upon the terms and conditions charted by the Legislature. Pertinent decisions interpreting similar statutes in other jurisdictions give support to this position.

"Similarly the city under the Housing Authorities Law is an agency of the state, functioning under state law to fulfill state purposes, and is not acting pursuant to its fundamental law to effect solely municipal objectives.

* * * * * * * *

"Upon the formation of the housing authority the state law thereupon and thereafter controlled the city and the housing authority and no other law concerning the acquisition, operation or disposition of property is applicable to the authority except as specifically provided."

*Housing Authority, etc. v. City of Los Angeles*, 38 *Cal. 2d* 853, 243 *P. 2d* 515 (*Sup. Ct.* 1952) noted in 21 *George Washington Law Rev.* 111 (1952).

"The relator grounds its contentions in support of the legal status of the Great Falls Housing Authority * * * upon the provisions of the Housing Authorities Law * * * to the exclusion of the general municipal statutes. On the other hand, the respondents (City) attack the legal status of the Great Falls Authority, and contend that all acts of the city council relative thereto must be governed by the statutes relating to municipal corporations. It is our opinion that the relator is correct, and the respondents in error."

*State ex rel. Great Falls Housing Authority v. City of Great Falls*, 110 *Mont.* 318, 100 *P. 2d* 915 (*Sup. Ct.* 1940).

See also and to the same effect *State ex rel. Helena Housing Authority v. City Council of City of Helena*, 125 *Mont.* 592, 242 *P. 2d* 250 (*Sup. Ct.* 1952); *Housing Authority of City of Oakland v. City of Oakland*, 222 *Cal. App. 2d* 771, 35 *Cal. Rptr.* 527 (*Dist. Ct. of Appeal*, 1963).

In the case last cited the court said,

"A housing authority cannot be foisted upon a city. It comes into existence only by action of the city council. When that body procures the creation of a housing authority and enters into a cooperation agreement with it, the council acts under state law, and contracts as an arm of the state, rather than in its strictly municipal capacity. When, as here, the housing authority has incurred expense and has contracted for federal funds or credit in reliance upon the cooperation agreement, that contract binds the city, cannot be abrogated by it, and can be modified or terminated only as permitted by the applicable statutes * * *."

■ In each of these cases the municipality, having created a local authority pursuant to statute, and having thereafter entered into a cooperation agreement with it, refused to fulfill the terms of agreement. In *Housing Authority, etc. v. City of Los Angeles, supra,* an ordinance was adopted purporting to rescind and cancel the agreement; in *State ex rel. City of Great Falls Housing Authority v. City of Great Falls, supra,* the municipality refused to rezone and vacate streets as it had promised to do in the cooperation agreement. In each case the local authority sought to compel performance of the agreement by writ of *mandamus* and in each case was successful. The courts concluded that having created a local housing authority, having entered into a contract with it and substantial partial performance having been undertaken the municipality was no longer free to do other than specifically perform the obligation it had undertaken. In sanctioning *mandamus* as a remedy the courts drew attention to the purely ministerial character of the duties resting upon the municipalities once they had entered into cooperation agreements. It was also pointed out, as mentioned above, that both municipality and housing authority were agents and instrumentalities of the state for the purpose of giving effect to an announced public policy of general public concern, and that the statutes in question made no provision for the kind of unilateral act of repudiation taken by the respective municipalities. Additionally it was noted in at least one case (*State ex rel. City of Great Falls Housing Authority v. City of Great Falls, supra*) that a cooperation agreement is a valid contract entitled to the full constitutional protection afforded by the "contract clauses" in both state and Federal constitutions. See generally, Note, *Enforceability of Contracts between Local Housing Authorities and City Councils,* 50 *Yale L. J.* 525 (1941).

■ It is pointed out by the City, however, that the relevant statutes of the states of California and Montana make no provision for the undertaking of such projects

directly by the municipalities, that neither statute contains a counterpart to *N. J. S. A.* 55:14A–56. This is true. Attention is also drawn to that section of the repealing ordinance which states that the City will assume all outstanding obligations and liabilities of the Authority and it is argued that this effectively answers the contention that third persons who have acted in reliance upon the cooperation Agreement may suffer. The resolution of this phase of the case must also be reached by ascertaining the legislative intent. Admittedly the statute gives no *express* power to a municipality to effect a transfer of public functions from the Authority to itself in a manner and at a time such as are here presented. Is such power to be implied? I think not. The Local Housing Authorities Law as first drafted and indeed until amended in 1956, made no provision for the functions of a housing authority to be carried on by the municipality itself. The enactment of the provision quoted above in 1956 (*N. J. S. A.* 55:14A–56) makes no mention of a transfer of functions from an authority to the municipality, either with or without an assumption on the part of the latter of any obligations of the former. It cannot, I think, be assumed that a power of this magnitude, requiring, as it inevitably will, a multitude of rearrangements with third parties including the Federal government, involving vast sums of money and fraught with a public interest of desperately important concern, may be distilled from the brief statutory provisions upon which the City relies. The fact that in this case the Federal government may have no objection is without point if statutory authority is lacking. To acknowledge that the City possesses the power it here purports to exercise is tantamount to a determination that it may dissolve the Authority almost at will. It is significant to note that in certain other statutes creating instrumentalities of a like nature and intended to perform functions similar to those entrusted to local housing authorities, the legislature has made specific provision for dissolution. *Redevelopment Agencies Law, N. J. S. A.*

40:55C-8; *Redevelopment Companies Law, N. J. S. A.* 55:14D-24. These statutes must be read *in pari materia* with the Local Housing Authorities Law. The inclusion of such provisions in certain acts and their exclusion in others, when all of the statutes are directed toward effectuating a single public purpose and were all enacted at or about the same time lends strong support to the conclusion that such exclusion was purposeful.

Reference is made above to Project 143. Here a preliminary study has been made but little more has been done. The Project has not received the approval of the governing body. As to this as well as to all future projects the repealing ordinances appear as a valid exercise of the rights set forth in *N. J. S. A.* 55:14A-56. Indeed the Housing Authority has made no very strong contention to the contrary. At the time of the adoption of the repealing ordinances the City created, by a further ordinance, a Division of Urban Renewal within the municipal Board of Finance and established certain offices or positions within this Division. The validity of this action has also been challenged. In view of the decision reached above, it is concluded that this action is valid but the effect of this ordinance as well as that of the repealing ordinances shall have no effect with respect to Project 103.